## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ENATRA HALE, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 2:16-cv-00498-RDP |
| } | |
| UNIVERSITY OF ALABAMA BOARD } | |
| OF TRUSTEES, et al., } | |
| } | |
| Defendants. } | |

## MEMORANDUM OPINION

This case is before the court on Defendant University of Alabama Board of Trustees' ("Board of Trustees") Motion for Summary Judgment (Doc. # 60) and Defendant Dr. Andries Steyn's Motion for Summary Judgment (Doc. # 62). The Motions are fully briefed (*see* Docs. # 61, 63, 67-68, 74-75), and they are ripe for decision. After careful review, and for the reasons explained below, Defendant Board of Trustees' Motion for Summary Judgment (Doc. # 60) is due to be granted in part and denied in part, and Defendant Steyn's Motion for Summary Judgment (Doc. # 62) is due to be granted.

## I.     Factual Background[1]

The court begins by analyzing Plaintiff's evidentiary objection to four declarations submitted by Defendants. It then discusses Plaintiff's work history under Dr. Steyn, based on the undisputed facts and the disputed facts as viewed in Plaintiff's favor. To conclude the

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

background section, this Opinion outlines pertinent information about Plaintiff's proposed comparators.

### A. The Challenged Declarations Will be Considered

As an initial matter, Plaintiff argues that the court should disregard four declarations submitted by employees of the University of Alabama at Birmingham ("UAB") because the declarations fail to specify what the declarant personally knows. (Doc. # 68 at 3-4). Federal Rule of Civil Procedure 56 requires a declaration to be based on personal knowledge (rather than information and belief) and to state the basis for the declarant's personal knowledge. *Duke v. Nationstar Mortg., L.L.C.*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012). The court finds that each challenged declaration is based on the declarant's personal knowledge and provides a basis for the declarant's personal knowledge supporting his or her testimony. (Docs. # 64-9 at 2-3; 64-10 at 2 (describing the declarant's work experience supporting her personal knowledge); 64-11 at 2-3; 64-12 at 2-3). Accordingly, Plaintiff's evidentiary challenge to these declarations is due to be overruled.

### B. Plaintiff's Work History

UAB initially hired Plaintiff, a black female, as a radiology clerk in 1987. (Doc. # 64-1 at 14, 47). She became a research assistant in 2003 and started working for Defendant Dr. Steyn, a UAB professor, in August 2003. (*Id.* at 47-48; Doc. # 64-3 at 29). At that time, Plaintiff facilitated the day-to-day operations of Dr. Steyn's laboratory (the "Steyn Lab") by maintaining equipment, ordering reagents, shipping cultures, working with radioisotopes, organizing the lab, training personnel about safety protocols, receiving and sending mail, and handling material transfer agreements, among other duties. (Docs. # 64-2 at 53; 64-3 at 39-42). Plaintiff did not perform scientific research for the Steyn Lab. (Docs. # 64-3 at 255-57; 64-11 at 4).

Dr. Steyn served as the Steyn Lab's principal investigator and was responsible for obtaining grant funding for the salaries and expenses incurred by the lab. (Docs. # 64-3 at 39; 64-9 at 4). UAB's microbiology department monitored his grant awards and expenses in order to ensure that Dr. Steyn did not overspend. (Doc. # 64-9 at 3). Kristina Sinclair, an employee in UAB's microbiology department, testified that the department projected out each lab's expenses for an 18 to 24 month period to ensure that each lab did not overspend its grants. (Doc. # 64-5 at 13-14, 95). Dr. Steyn determined how the grant funds were to be distributed to fund his staff's salaries. (Doc. # 64-10 at 4). Dr. Steyn lived in South Africa during the relevant time period, so Dr. Joel Glasgow directed the Steyn Lab's day-to-day research activities in Birmingham. (Doc. # 64-11 at 3). Dr. Steyn's research laboratory was located on the third floor of the Bevill Biomedical Research Building ("BBRB"). (Doc. # 64-9 at 3). The BBRB also housed a Biosafety Level 2 laboratory ("BSL-2 Lab") and a Biosafety Level 3 laboratory ("BSL-3 Lab") that Dr. Steyn's personnel used. (*See* Doc. # 64-12 at 3-4) (describing the BSL-2 and BSL-3 Labs).

From July 2012 to December 2013, three grants funded Plaintiff's UAB salary in a consistent proportion. (*See* Doc. # 64-4 at 55-63). The "Mechanism of Mycobacterium Tuberculosis Persistence" grant funded 50 percent of Plaintiff's salary during this period. (*See id.*). This grant ended on June 30, 2014. (Doc. # 64-5 at 93). The "Carbon Monoxide and Mycobacterium Tuberculosis Persistence" grant funded 40 percent of Plaintiff's salary from July 2012 to December 2013. (*See* Doc. # 64-4 at 55-63). This grant ended in June 2016. (Doc. # 64-5 at 93-94). The "Role of WhiB3 in M. Tuberculosis Virulence" grant funded 10 percent of Plaintiff's salary from July 2012 to December 2013. (*See* Doc. # 64-4 at 55-63). This grant ended in March 2015. (Doc. # 64-5 at 93). Steyn testified that he received notice of an

upcoming decrease in available funding in November 2013. (Doc. # 64-3 at 252). And, Sinclair told Steyn that he needed to "rightsize his lab" in late 2013 and early 2014.[2] (Doc. # 64-5 at 110-11). From January 2014 to June 2014, the "Carbon Monoxide and Mycobacterium Tuberculosis Persistence" grant funded 90 percent of Plaintiff's salary, and the "Role of WhiB3 in M. Tuberculosis Virulence" funded 10 percent of her salary. (Doc. # 64-4 at 64-65).

On January 28, 2014, Plaintiff met with Dr. Steyn. (Doc. # 64-1 at 59). Plaintiff testified that Dr. Steyn "wanted [her] out of his lab" because she had reported her safety concerns to UAB's Occupational Health and Safety office. (*Id.*). Dr. Steyn demanded that Plaintiff resign her position, but she refused.[3] (*Id.* at 60). Plaintiff declined Dr. Steyn's demand to submit a resignation letter, but she intended to give him a letter reflecting her intent to transfer to another UAB position. (*Id.* at 65-66). On February 5, 2014, Dr. Steyn emailed Plaintiff a sample resignation letter and asked her to fill it out and return it to him. (Doc. # 64-13 at 141). Plaintiff responded that she would "get the letter to [Steyn] as soon as possible." (*Id.* at 142). On February 13, 2014, Dr. Steyn reiterated to Plaintiff that he needed "that letter by the end of today" and asked her to date it for June 1, 2014. (*Id.* at 151). Plaintiff construed this email as a request for a resignation. (Doc. # 64-1 at 69).

On February 14, 2014, Plaintiff signed and sent Dr. Steyn a letter stating that she would transfer from her position in the Steyn Lab on or before June 1, 2014. (Doc. # 64-4 at 22). When she submitted the letter, she intended to transfer to another job on or before June 1, 2014.

---

[2] Plaintiff objects to this undisputed fact in her opposition brief. (Doc. # 67 at 9). But, she has not cited any Rule 56 evidence that would indicate the discussions between Sinclair and Dr. Steyn did not occur. Therefore, the court accepts Sinclair's testimony as an undisputed fact for purposes of this motion.

[3] Dr. Steyn recounts his January 2014 meeting with Plaintiff differently. According to Steyn, he told Plaintiff on January 31, 2014 that her job would be ending because his lab lacked funding. (Doc. # 64-3 at 124). Because Plaintiff is the non-movant here, the court resolves this factual dispute in her favor.

(Doc. # 64-1 at 72). She applied for other UAB positions, but failed to obtain another job. (*See id.*).

On May 1, 2014, Sinclair asked Plaintiff about where (i.e., which department) she would be transferring. (Doc. # 64-16 at 53). Plaintiff responded that she had not obtained another position and had not met with UAB's human relations office. (*Id.*). On May 2, 2014, Sinclair met with Plaintiff and advised her to contact UAB's employee relations department if she felt that the issue required "outside departmental intervention." (*Id.* at 57). That same day, Sinclair sent Dr. Steyn and Dr. Glasgow a proposed termination memorandum for Plaintiff. (*Id.* at 54-56). She wrote that the memorandum could be used "if you decide to move forward with eliminating [Plaintiff's] position because of the transfer of the BSL-3 lab to SEBLAB."[4] (*Id.* at 54). Sinclair's draft memorandum stated that Plaintiff's employment would be terminated on May 31, 2014 because of the lab relocation. (*Id.* at 44).

On May 7, 2014, Plaintiff met with Sinclair, Anne Graham, and Danielle Coteat. (Docs. # 64-1 at 79-80; 64-22 at 42). By that time, Plaintiff asserts, she believed that the February 2014 letter she had submitted was illegitimate. (Doc. # 64-1 at 81-82). Plaintiff recalled that she denied signing the letter Dr. Steyn presented to her and complained that Steyn had coerced her to resign because she had raised safety concerns with UAB's Occupational Health & Safety office. (*Id.* at 79). She testified that Sinclair spoke aggressively during the meeting, attempted to intimidate her, and claimed that no one liked working with her. (*Id.* at 80-81). At the end of the meeting, Graham told Plaintiff that the letter was legitimate and that she would have to resign on

---

[4] SEBLAB refers to the Southeastern Biocontainment Lab, which is located on UAB's campus across the street from the BBRB. (Doc. # 64-12 at 4). Dr. Steyn testified that UAB closed the BSL-2 Lab and BSL-3 Lab in the spring or early summer of 2014, and he moved research activities to the SEBLAB thereafter. (Doc. # 64-3 at 246-47).

June 1.  (*Id.* at 82).  Twenty minutes later, Sinclair called Plaintiff to another meeting where Graham informed her that the letter was not a valid resignation letter.  (*Id.*).

The next day, on May 8, 2014, Sinclair informed Dr. Steyn that Plaintiff had "rescinded her resignation."  (Doc. # 64-16 at 58).  Dr. Steyn then sent the following email to Plaintiff:

> What???
> Enatra, what is going on?  Is this true?  You offered your resignation and signed a letter; that is what you agreed upon and we had long discussions about it.  You told me repeatedly that you have no issue in resigning!  In anticipation of you leaving the lab, I already initiated efforts to change the research focus of my lab.  This is a disaster…
>
> Please send me a list of your job duties; I will need it by tomorrow.

(*Id.* at 59).  Plaintiff believed that the email was threatening and angry.  (Doc. # 64-1 at 188-89).  On May 8 or 9, 2014, Plaintiff met with Kelly Mayer, another UAB human relations employee, and complained about Dr. Steyn's mistreatment of her.  (*Id.* at 134-35).  She told Mayer that she interpreted Dr. Steyn's demand for a description of job duties as a threat because he had stated that she was "disrupting the laboratory."  (*Id.* at 136).  She also complained that Steyn Lab employees were monitoring her work activities and recording when she arrived at work and ate lunch.  (*Id.* at 136-37).  On May 12, 2014, Plaintiff sent a description of her current job duties to Dr. Steyn and Sinclair.  (Doc. # 64-2 at 53).

In June 2014, Dr. Steyn assigned Plaintiff additional "scientific duties" that she was to perform in order to receive funding for her salary from the Steyn Lab's grants.  (*Id.* at 54-55).  Among other things, Steyn instructed Plaintiff to change and maintain animal cages in the BSL-2 Lab, stock the BSL-3 Lab's dressing room with supplies, prepare materials for the BSL-2 and BSL-3 Labs, and maintain and clean the BSL-2 Lab.  (*Id.*).  He also directed Plaintiff to start work at 8 a.m. so that she would be available to assist other Steyn Lab personnel.  (*Id.* at 55).  Plaintiff testified that Dr. Steyn "removed" her from working in the BSL-3 Lab after she

withdrew her letter and assigned her to help other Steyn Lab employees and clean up the laboratories. (Doc. # 64-1 at 191). She contends that Steyn assigned her additional cleaning duties in retaliation for her complaints about safety issues in the laboratories. (*Id.* at 192). She also claims that Steyn reassigned some of her administrative duties. (*Id.* at 193-94). From July 2014 to December 2014, the "Carbon Monoxide and Mycobacterium Tuberculosis Persistence" grant funded all of Plaintiff's salary. (Doc. # 64-4 at 66-67).

On July 17, 2014, Plaintiff met with Dr. Steyn, Dr. Glasgow, and Sinclair. (Doc. # 64-1 at 96). Plaintiff testified that Dr. Steyn used profanities and derogatory language during the meeting. (*Id.*). Dr. Steyn claimed that others in the Steyn Lab disliked Plaintiff's work habits and only sought her assistance as a last resort. (*Id.* at 96-97, 100). When Plaintiff asked to speak with the employees who had complained about her, Dr. Steyn responded that "he didn't have to bring any goddamn body to any goddamn meeting to prove anything to [Plaintiff]."[5] (*Id.* at 97). Plaintiff complained about Sinclair's attendance at the meeting because Sinclair's aggressiveness towards her during the May 2014 meeting made Plaintiff uncomfortable. (*Id.* at 98). Dr. Steyn asked Sinclair to remain in the meeting. (Doc. # 64-6 at 29). During the meeting, Dr. Steyn instructed Plaintiff to clean up the laboratory and to address Dr. Glasgow as "Doctor" rather than by his first name. (Doc. # 64-1 at 101). Plaintiff contends Dr. Steyn did not direct any other employee to address Dr. Glasgow by his title, rather than his first name. (Doc. # 64-3 at 189).

Plaintiff also testified that Dr. Steyn often displayed an unwelcome manner towards black delivery workers and coworkers and asked them why they were in his lab. (Doc. # 64-1 at 169-71). She described his discriminatory actions as "subtle." (*Id.* at 172). She perceived that Dr. Steyn dismissed her complaints about safety protocol violations, but addressed concerns raised by other Steyn Lab employees. (*Id.* at 125). She recalled that Dr. Steyn once described

---

[5] Steyn denies any recollection of this statement. (Doc. # 64-3 at 267-68).

her as "bitchy" and directed her to "do what I say do" when she was discussing an issue regarding the BSL-3 Lab.  (*Id.* at 124).

On September 29, 2014, Sinclair wrote Dr. Steyn and discussed a funding shortfall that UAB had projected for his lab in 2015.  (Doc. # 64-16 at 204).  She prepared two termination letters for Plaintiff and Jason Freeman, both of whom were eligible for severance pay if terminated.  (*Id.* at 204-05).  Freeman, a black male, worked as a research technician in the Steyn Lab and did not perform scientific research.  (Doc. # 64-3 at 236, 259).  Sinclair advised Dr. Steyn that three of his employees were temporary or irregular employees who worked on an "at will" basis.  (Doc. # 64-16 at 204).  Dr. Steyn decided to proceed with terminating Plaintiff's employment, as well as that of Freeman, on October 8, 2014.  (*Id.*).  On October 13, 2014, Steyn informed Plaintiff of her termination in a Skype telephone call and read the termination memorandum to her.  (Doc. # 64-1 at 104-05).  The memo stated that Steyn terminated Plaintiff due to a lack of funding.  (Doc. # 64-24 at 2).  Upon her termination on November 9, 2014, Plaintiff received three months' severance pay.  (*Id.*).  As of the date of her dismissal, Plaintiff had the longest tenure of any employee in the Steyn Lab.  (Doc. # 64-3 at 45).

## C.    Plaintiff's Proposed Comparators in the Steyn Lab

After Dr. Steyn terminated Plaintiff and Freeman in October 2014, that left six employees working in the Steyn Lab.  (*See* Doc. # 64-16 at 204-05) (listing all of the employees in the Steyn Lab as of September 29, 2014).  Plaintiff has identified four of the six employees as potential comparators in her opposition brief.  (Doc. # 67 at 20-21).  The court discusses each proposed comparator below and then briefly addresses the other employees in the Steyn Lab.

### 1.    Dr. Glasgow

Dr. Glasgow, a white male, is an assistant professor at UAB who began working in the Steyn Lab in August 2011.  (*See* Doc. # 64-3 at 43, 189, 257; 64-11 at 2-3).  He obtained a doctoral degree in cell biology from the University of Texas Medical Branch in 2000 and has worked continuously in higher education since 2005.  (Doc. # 64-11 at 2).  During Plaintiff's tenure in the Steyn Lab, Dr. Glasgow managed the Lab's activities because Dr. Steyn resided in South Africa.  (*Id.* at 3).  Grants awarded to the Steyn Lab by the National Institutes of Health required a faculty member to be present and overseeing research activities conducted under the grants.  (*Id.*).  Dr. Glasgow performed scientific research for Dr. Steyn.  (Doc. # 64-3 at 257).

### 2.    Dr. Vikram Saini

Steyn hired Dr. Saini, an Indian male, in 2010 as a postdoctoral fellow.  (Docs. # 64-3 at 257-58; 64-34 at 4).  Dr. Saini obtained a master's degree from Kurkshetra University in India in 2003 and a doctoral degree in biochemistry from the University of Delhi in India in 2011.  (Doc. # 64-34 at 65).  Dr. Saini performed scientific research for Dr. Steyn as a postdoctoral fellow.  (Doc. # 64-3 at 258).

### 3.    Krishna Chaitanya Chinta

Steyn hired Chinta, an Indian male, in 2012 as a temporary research assistant.  (*See* Docs. # 64-3 at 258; 64-28 at 3-5).  Chinta holds a master's degree in biotechnology.  (Doc. # 64-28 at 7).  He worked for three years at a molecular cell biology laboratory in Hyderabad, India before working for Dr. Steyn.  (*Id.*).  He performed scientific research for Dr. Steyn as a research assistant.  (Doc. # 64-3 at 258-59).  Dr. Glasgow declared that Chinta's laboratory work was more critical to the laboratory's success and funding because he "performed independent, NIH-funded scientific research."  (Doc. # 64-11 at 4).

### 4. Vineel Reddy

Steyn hired Reddy, an Indian male, in 2013 as a postdoctoral scholar. (Docs. # 64-3 at 261; 64-33 at 9). Reddy performed scientific research in the Steyn Lab. (Doc. # 64-3 at 261).

### 5. Other Steyn Lab Personnel

Dr. James Mazorodze, an African male, worked as a visiting scientist in the Steyn Lab. (Doc. # 64-3 at 259-60). An AIDS research pilot grant funded his salary. (*Id.* at 260). On October 31, 2014, he voluntarily resigned because he knew that the Steyn Lab lacked funding. (*Id.* at 260-61).

Aliza Steyn, a white female and Dr. Steyn's daughter, worked as a part-time research technician in the Steyn Lab. (*Id.* at 261-62). She did not work in the BSL-3 Lab and did not perform scientific research. (*Id.* at 262). Steyn terminated her in January 2015 due to a lack of funding. (*Id.*).

## II. Procedural History

Plaintiff's Second Amended Complaint raises race discrimination, racial harassment, and sex discrimination claims against Defendant Board of Trustees under Title VII of the Civil Rights Act. (Doc. # 23 at ¶¶ 35-45). Plaintiff also claims that Defendant Dr. Steyn committed tortious deceit and misrepresentation when he funded her salary through grants that had fewer funds available and when he wrote in the termination memorandum that she was being terminated due to a lack of funding. (*Id.* at ¶¶ 46-50). Finally, she contends that Defendants Board of Trustees and Steyn both retaliated against her for exercising her First Amendment free speech rights because Dr. Steyn demanded her resignation and harassed her after she reported safety concerns regarding the Steyn Lab's operations. (*Id.* at ¶¶ 51-55).

In March 2017, Defendant Steyn moved to dismiss some of the claims against him in the Second Amended Complaint. (Doc. # 34). Among other arguments, Dr. Steyn contended that the First Amendment retaliation claim against him should be dismissed because Plaintiff engaged in speech as an employee, not a citizen, and her speech was not directed to the public at large. (*Id.* at 10-21). The court dismissed Plaintiff's First Amendment retaliation claim against Defendant Steyn because it was clear based upon her own pleadings that her alleged speech took place in her role as an employee with assigned responsibility for enforcing safety protocols in the Steyn Lab. (*See* Doc. # 50 at 6-10).

## III.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v.*

*Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents

a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV. Analysis

After careful review, the court concludes that Defendants are entitled to summary judgment on all claims except for Plaintiff's Title VII race discrimination claim against Defendant Board of Trustees concerning her termination.

### A. Defendant Board of Trustees is Entitled to Summary Judgment on Plaintiff's Title VII Sex Discrimination Claim, but Not Her Race Discrimination Claim

Defendant Board of Trustees first contends that Plaintiff cannot raise a *prima facie* race or sex discriminatory termination claim because her research assistant position was left unfilled. (Doc. # 61 at 19). Second, the Board of Trustees argues that the unrebutted evidence establishes it was a funding shortfall that led to Plaintiff's termination. (*Id.* at 20-21). Third, it insists that the Rule 56 record--including Plaintiff's deposition testimony and discovery responses--offers no evidence of pretext. (*Id.* at 24).

Plaintiff responds that she can establish a *prima facie* case of race and sex discrimination because the non-African-American men in the Steyn Lab all retained their positions when Freeman and she were terminated. (Doc. # 67 at 20-21). She further contends that Dr. Steyn's reason for terminating her was pretextual because he articulated inconsistent reasons for seeking her termination between January 2014 and October 2014, he demanded her resignation letter several times before relying on any purported lack of funding as a reason, he continued to employ her after the "Mechanism of Mycobacterium Tuberculosis Persistence" grant ended, and

he gave inconsistent testimony about when he informed Plaintiff of the Steyn Lab's funding concerns. (*Id.* at 22-27).

Title VII discrimination claims that rely on circumstantial evidence normally are evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) ("A plaintiff typically makes a case of discrimination through indirect evidence using the burden-shifting framework set out in *McDonnell Douglas* . . . ."). Therefore, the court begins its analysis of Plaintiff's Title VII discrimination claims under the well-established *McDonnell Douglas* framework.

Under that framework, a plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Once a plaintiff has presented a *prima facie* case (and, thereby, has raised the presumption of discrimination), the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls away and the burden again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

### 1. Plaintiff's *Prima Facie* Case

A Title VII plaintiff claiming that she suffered a discriminatory discharge must show four factors to establish a *prima facie* case: "(1) [she] is a member of a protected class [here, Plaintiff is based on her race and sex]; (2) [she] was qualified for the position; (3) [she] suffered an adverse employment action; and (4) [she]…was treated less favorably than a similarly-situated individual outside [her] protected class."[6] *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, Defendant Board of Trustees' prima facie arguments are limited to whether Plaintiff can meet the fourth prong of the *prima facie* test with respect to her race and sex discrimination claims.

Plaintiff responds that Dr. Glasgow, Dr. Saini, Chinta, and Reddy are male comparators who are not African-American and who retained their positions when she was terminated. (Doc. # 67 at 20-21). Plaintiff has the burden of showing that she and the alleged comparators are similarly situated in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "That is, the plaintiff's comparators must perform the same type of tasks that the plaintiff performs at work." *Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012). "'The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'" *Gaines v. Johnson*, 44 F. Supp. 3d 1169, 1178 (N.D. Ala. 2014) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)). When determining whether an individual is a proper comparator, courts examine the amount of years an individual has worked for the employer, the type of expertise the individual has, and

---

[6] Defendant Board of Trustees argues that Plaintiff can only establish a *prima facie* case in these circumstances if she shows that her former position was filled by an individual of a different race and/or sex. (Doc. # 61 at 19) (quoting *Edwards v. Wallace Comm. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995)). But, after the Eleventh Circuit issued *Edwards*, it announced formulations of the *prima facie* case that allow a terminated plaintiff to establish a *prima facie* case where he or she is treated less favorably than a similarly-situated employee who remained employed. *E.g.*, *Maynard*, 342 F.3d at 1289.

whether the alleged comparator has the same supervisor as the plaintiff, among other factors. *See Davis*, 872 F. Supp. 2d at 1310. *See also Gaines*, 44 F. Supp. 3d at 1178. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (emphasis omitted).

Here, the court readily finds that Dr. Glasgow, Dr. Saini, and Reddy are not proper comparators to Plaintiff. Dr. Glasgow does not qualify as a comparator because, as an assistant professor, he did not perform the same type of tasks that Plaintiff performed as a research assistant. (*See* Doc. # 64-11 at 3) (describing Dr. Glasgow's supervisory duties). Dr. Glasgow also had substantial academic expertise as a professor that Plaintiff lacked. (*Id.* at 2-3) (describing Dr. Glasgow's educational and academic experience). *Cf. Davis*, 872 F. Supp. 2d at 1310 (stating that a proposed comparator's expertise can be considered in determining whether the person is an appropriate comparator).

Similarly, Dr. Saini is not an appropriate comparator because he performed scientific research tasks that Plaintiff did not perform, possessed academic expertise as a postdoctoral fellow that Plaintiff lacked, and held a different title[7] than Plaintiff. (Docs. # 64-3 at 257-58; 64-34 at 4, 65) *Cf. Davis*, 872 F. Supp. 2d at 1310.

The court is not convinced that Reddy is a suitable comparator because he held a different job than Plaintiff (postdoctoral scholar versus research assistant) and performed scientific research that she did not conduct. (Docs. # 64-3 at 261; 64-33 at 9). *Cf. Davis*, 872 F. Supp. 2d at 1310. Accordingly, Plaintiff cannot rely on Dr. Steyn's differential treatment of these employees to establish a *prima facie* race discrimination or sex discrimination claim.

---

[7] The difference in titles is not a controlling factor, but it dovetails with the above-referenced differences in work performed and academic background of Plaintiff and Dr. Saini.

The court finds it to be a closer question as to whether Chinta is a suitable comparator for purposes of a *prima facie* discrimination case. Chinta and Plaintiff held the same title, research assistant, and they worked under the same supervisors in the Steyn Lab. (*See* Docs. # 64-1 at 47-48; 64-28 at 5). Moreover, Plaintiff worked in the Steyn Lab for several years prior to Chinta's hiring, yet she was the first research assistant terminated. Nevertheless, the Rule 56 record reveals that Chinta is not a "nearly identical" employee to Plaintiff. He held a master's degree in biotechnology that Plaintiff lacked. (Doc. # 64-28 at 7). And, he performed independent scientific research in the Steyn Lab, whereas Plaintiff worked on administrative duties and scientific support tasks. (*See* Doc. # 64-11 at 4). Because Chinta possessed a higher level of expertise in a relevant scientific field and performed different tasks than Plaintiff, he is not an appropriate comparator. *See Davis*, 872 F. Supp. 2d at 1310. Thus, because Plaintiff has failed to show the existence of a similarly situated employee who Dr. Steyn retained, she has not established a *prima facie* case of race discrimination or sex discrimination through her four proposed comparators. But this does not end the court's inquiry.

The court still must consider whether Plaintiff can proceed under a mosaic claim. In *Smith v. Lockheed-Martin*, the Eleventh Circuit held that a plaintiff does not always have to establish a *prima facie* case under the *McDonnell Douglas* framework to present a triable Title VII claim of unlawful discrimination through circumstantial evidence. 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can present a triable issue of discriminatory intent through a convincing mosaic of circumstantial evidence from which a reasonable jury could find intentional discrimination by the decisionmaker. *Id.* Or, stated in other words, "[a] 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of

discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1162 (N.D. Ala. 2018) (quoting *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017), *vacated*, 893 F.3d 1352 (11th Cir. 2018) (*en banc*)). In *Lockheed-Martin*, the circumstantial evidence presented by the plaintiffs was overwhelming and included: (a) a documented history of disparate treatment of Caucasian and African-American employees; (b) a spreadsheet listing employees under investigation by name and race that the defendant's disciplinary review committee used to make disciplinary decisions; and (c) a news program reporting the defendant's struggles with racism in the workplace, which focused on violence by a white supremacist. *See id.* at 1329-40. The Eleventh Circuit concluded, among other reasons, that the plaintiffs presented a triable race discrimination claim because the defendant "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

Here, although Plaintiff's evidence of discrimination is weaker than the evidence presented in *Lockheed-Martin*, the court finds sufficient Rule 56 evidence for Plaintiff to proceed to trial on a mosaic theory with regard to her claim of race discrimination. First, the timing of Plaintiff's termination is suspicious because Sinclair notified Dr. Steyn about the lab's financial issues and the need to cut personnel in late 2013 or early 2014, several months before Plaintiff's termination. (Doc. # 64-5 at 110-11). *Cf. Moore*, 304 F. Supp. 3d at 1162 (describing suspicious timing of an adverse action as a factor to be considered). Second, Plaintiff presents evidence of suspiciously preferential treatment of non-black employees insofar as only black employees were terminated when Dr. Steyn downsized his lab at the beginning of October 2014. He initially terminated Plaintiff and Freeman even though he employed three other people on an "at will"

basis and would not have been required to provide them severance pay. (*See* Doc. # 64-16 at 204-05). Third, as discussed below, Plaintiff presents evidence supporting her position that the "lack of funding" rationale was a pretextual justification for her termination. Among other evidence, this Rule 56 evidence presents a sufficient mosaic of evidence for Plaintiff's Title VII race discrimination claim to proceed, despite the lack of a comparator. After careful review, however, the court does not find sufficient evidence of sex discrimination to support such a claim under the mosaic theory.

## 2. Plaintiff's Pretext Evidence

Once a *prima facie* case is established, an employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. Analysis of whether the employer has met this burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light," *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, a plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason, but must "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

"Pretext may [ ] be established by proof of inconsistent statements or shifting explanations for the adverse employment decision, suggesting that the articulated reasons are

recently fabricated or false." *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013). Shifting explanations for a termination allow a factfinder to question the employer's credibility and find that the employer is "dissembling to cover up a discriminatory purpose." *Cleveland v. Home Shopping Network*, 369 F.3d 1189, 1194-95 (11th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000)). An employer's different explanations for an adverse employment action might not create a triable issue of pretext, though, if the reasons given are not necessarily inconsistent. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1458-59 (11th Cir. 1997) (concluding that the employer's inconsistent statements about using seniority to complete a reduction in force were not inconsistent where the evidence showed that the employer avoided considering seniority for most of its decisions, but used lack of seniority to terminate a particular electrician).

Defendant Board of Trustees argues that Dr. Steyn terminated Plaintiff due to a lack of funding for his laboratory. (Doc. # 61 at 19-21). If true, this obviously is is a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 324-25 (5th Cir. 2002) (affirming a district court's conclusion that the nonexistence of a position due to a lack of funding constituted a legitimate, nondiscriminatory reason for not promoting the plaintiff); *Sundaram v. Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 579 (E.D.N.Y. 2006) (finding no triable issue of pretext for a discrimination claim where the plaintiff presented no evidence that defendants' "lack of funding" justification was false). The court therefore must determine whether Plaintiff's pretext arguments present a triable issue of fact.

Plaintiff initially points to the shifting explanations proposed for Plaintiff's termination between January 2014 and October 2014. (Doc. # 67 at 22-23). The court agrees that Dr. Steyn and other UAB personnel offered inconsistent explanations for seeking Plaintiff's termination, as

(1) Dr. Steyn reportedly told Plaintiff in January 2014 that he wanted her to resign because of her safety-related complaints, (2) Sinclair proposed to Dr. Steyn in May 2014 that he might terminate Plaintiff because he was moving operations to the SEBLAB, and (3) Dr. Steyn ultimately justified Plaintiff's termination in October 2014 on the lack of grant funding. (*See* Docs. # 64-1 at 59-60; 64-16 at 54-56; 64-24 at 2). At a minimum, the proffered reasons for terminating Plaintiff in May 2014 and October 2014 are sufficiently inconsistent for a factfinder to discredit Dr. Steyn's explanation for the termination. *Cleveland*, 369 F.3d at 1194-95. This flaw in Dr. Steyn's credibility is supported by his statement that he informed Plaintiff about the Steyn Lab's financial situation for the first time in June 2014, rather than January 2014.[8] (*See* Doc. # 64-3 at 155). The court finds that Plaintiff's Rule 56 evidence of shifting justifications for her termination is sufficient for a reasonable factfinder to question Dr. Steyn's credibility and determine that the actual reason for Plaintiff's termination was her race, when considered with the additional evidence discussed above.

### 3.    Conclusion

For the reasons explained above, Defendant Board of Trustees' motion for summary judgment is due to be denied on Plaintiff's Title VII race discrimination claim in Count I of the Second Amended Complaint. It is due to be granted summary judgment on Plaintiff's Title VII sex discrimination claim in Count III because Plaintiff has failed to present a *prima facie* case of sex discrimination under *McDonnell Douglas* or a convincing mosaic of evidence supporting her sex discrimination claim. And, even if Plaintiff had established either showing, there is no evidence of pretext in the Rule 56 record with respect to her sex discrimination claim.

---

[8]   The court observes that Dr. Steyn gave this answer in response to a leading question by Plaintiff's attorney. (Doc. # 64-3 at 155). But, Dr. Steyn did not qualify his answer, and Plaintiff has disputed Dr. Steyn's account of their January 2014 meeting. (*See id.*). Therefore, the court finds that the answer is evidence contradicting Dr. Steyn's testimony that he discussed the Steyn Lab's financial situation with Plaintiff in January 2014. At a minimum, this is an issue of fact for the jury.

**B.    Defendant Board of Trustees is Due to be Granted Summary Judgment on Plaintiff's Racial Harassment Claim**

Defendant Board of Trustees argues that it is due to be granted summary judgment on Plaintiff's racial harassment claim because the incidents of harassment at issue are neither frequent nor severe enough to create a hostile work environment. (*See* Doc. # 61 at 26-27). The Board of Trustees also contends that there is no Rule 56 evidence to show that racial harassment unreasonably interfered with Plaintiff's job performance. (*Id.* at 27). Finally, it argues that it is not liable for any harassment Plaintiff suffered because the tangible employment action at issue -- Plaintiff's termination -- is not connected to the racial harassment. (*Id.* at 27-29).

Plaintiff responds that Dr. Steyn's actions towards her between January 2014 and October 2014 were abusive, hostile, and only directed at black employees. (Doc. # 67 at 29-32). She argues that Dr. Steyn created a charged environment, required her to clean up for other employees, required her to refer to the lab's manager by his title, and forced her to "endure significant humiliation." (*Id.* at 32-33). She does not argue that the reported harassment unreasonably interfered with her performance. (*Id.* at 33-34). Finally, she contends that the Board of Trustees is liable for Dr. Steyn's harassment because he ultimately terminated her in furtherance of the harassment. (*Id.* at 34-35).

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Five elements must be shown for a successful hostile work environment claim: (1) the plaintiff is a member of a protected group; (2) he or she "has been subject to unwelcome harassment"; (3) the harassment

was based on a protected characteristic of the plaintiff; (4) the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) the employer is responsible for the abusive working environment "under either a theory of vicarious or of direct liability." *Id.*

Harassment suffered by a plaintiff must meet both an objective and subjective standard to support a hostile work environment claim. *Miller*, 277 F.3d at 1276. That is, the harassment must create an environment that a reasonable person would find hostile or abusive, and the plaintiff must subjectively perceive that the environment is hostile or abusive. *Id.* To evaluate the objective severity of alleged harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "These four components are viewed together; for instance, infrequent conduct will not necessarily preclude a claim as a matter of law, particularly if the conduct is sufficiently severe, threatening, and/or interferes with an employee's job." *Shaling v. UPS Ground Freight*, 202 F. Supp. 3d 1283, 1292 (N.D. Ala. 2016). The court emphasizes that Title VII "does not operate as a general ban on . . . rude or offensive behavior." *Leslie v. Cumulus Media, Inc.*, 814 F. Supp. 2d 1326, 1343 (S.D. Ala. 2011) (citation omitted). *See also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*) ("Title VII is not a federal 'civility code.'"). "Teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Jones v. City of Lakeland*, 318 F. App'x 730, 735 (11th Cir. 2008). Ultimately, in assessing the severity of an employer's conduct, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998). *See also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

Plaintiff points to the following evidence to support her racially hostile work environment claim:

- On one occasion, Dr. Steyn instructed Plaintiff by email to fill out a form notice of resignation and send it back to him. Dr. Steyn reiterated his request for Plaintiff to submit a resignation letter eight days later. Plaintiff complied by submitting a letter discussing her intent to transfer.

- Sinclair discussed the steps Plaintiff needed to complete before leaving the Steyn Lab in June 2014, following Plaintiff's submission of the February 2014 letter.

- Dr. Steyn wrote to Plaintiff that her decision to withdraw the transfer letter was "disastrous."

- Sinclair spoke to Plaintiff in an aggressive and hostile manner when Plaintiff told her that she did not wish to resign.

- Dr. Steyn required Plaintiff to report to work at a certain time when male employees were not required to work during certain hours.

- Dr. Steyn assigned Plaintiff "more subservient duties" than other Steyn Lab personnel, such as cleaning up the labs.

- Dr. Steyn acted less cordially towards black coworkers, delivery personnel, and visitors than non-black people.

- On July 17, 2014, Dr. Steyn described Plaintiff as "bitchy" and directed her "to do what I say do."

- Dr. Steyn refused to bring other employees into the July 2014 meeting when Plaintiff asked to meet with them and directed profanities towards Plaintiff.

- Dr. Steyn required Plaintiff to address Dr. Glasgow by his title, but did not require other employees to do so.

- Dr. Steyn terminated Plaintiff in October 2014, effective November 2014.

(Doc. # 67 at 29-32). These incidents allegedly occurred over an approximately ten-month period. (*Id.* at 29).

Simply stated, these incidents are not objectively severe or pervasive enough to support a triable hostile work environment claim. Although Dr. Steyn's comments may have been rude or offensive to Plaintiff, she has not presented conduct severe enough or persistent enough to survive summary judgment on this claim. *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (concluding that "sporadic and isolated" uses of racially derogatory language over a two-year period do not constitute objectively severe or pervasive conduct). Many of the incidents Plaintiff points to, such as Dr. Steyn's characterization of her withdrawing the February 2014 letter, have no clear connection to her race. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (explaining that "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis"). Plaintiff has not provided evidence that Dr. Steyn or any other Steyn Lab employee used racial epithets. *See Moore v. Jimmy Dean/Sara Lee Foods, Inc.*, 520 F. Supp. 2d 1359, 1369 (N.D. Ala. 2007) (finding that the alleged harassment was not sufficiently severe where the plaintiff presented "no openly discriminatory comments, no racial epithets, and no veiled racial remarks"). Moreover, Plaintiff has not argued or offered evidence that the alleged harassment interfered with her job performance. *Cf. Miller*, 277 F.3d at 1276. Based upon the evidence in the Rule 56 record, even taking each of Plaintiff's assertions as true, the court determines that a reasonable jury could not find Dr. Steyn's conduct sufficiently severe to change the terms or conditions of Plaintiff's

employment. Therefore, Defendant Board of Trustees is entitled to summary judgment on Plaintiff's Title VII racial harassment claim.[9]

### C. Defendant Steyn is Due to be Granted Summary Judgment on Plaintiff's Deceit Claim

First, Defendant Steyn argues that he never misrepresented a material fact because the Rule 56 evidence shows that the Steyn Lab was running out of funding. (Doc. # 63 at 19-20). Second, he contends that he did not willfully deceive Plaintiff or act recklessly because Plaintiff has only speculated that there were sufficient funds to keep her employed. (*Id.* at 20-21). Third, he insists that the Rule 56 record shows Plaintiff did not act in reliance on the information given in the October 9, 2014 termination memorandum. (*Id.* at 21). Fourth, he argues that he is not liable for deceit under Alabama Code § 6-5-104 because there is no dispute that he believed that he lacked funding and he had reasonable grounds to believe that assertion was true. (*Id.* at 21-22). Finally, Defendant Dr. Steyn claims that he is entitled to state-agent immunity. (*Id.* at 23-26).

Plaintiff responds that Dr. Steyn misrepresented the extent of his funding problems in January 2014 when he attempted to force her to resign. (Doc. # 68 at 12). And, she claims he misrepresented his true reason for terminating Plaintiff in October 2014 because he had proposed terminating Plaintiff for a different reason in May 2014. (*Id.* at 15-16). Accordingly to Plaintiff, Dr. Steyn unlawfully suppressed material facts when he failed to disclose how the grants could have been used to pay for her continued employment. (*Id.* at 16-17). Plaintiff also appears to argue that Dr. Steyn misrepresented his reason for terminating her during his deposition in this matter. (*See id.* at 18-19). Plaintiff points to Dr. Steyn's decision to pay for her salary from a

---

[9] The court need not decide -- and does not decide -- whether Defendant Board of Trustees could be held liable for Dr. Steyn's harassment if it were objectively and subjectively severe enough to affect Plaintiff's work conditions.

grant with the least funds available as evidence of deceit. (*Id.* at 20-21). However, significantly, Plaintiff does not specify how she acted in reliance on the termination memorandum to her detriment. (*See id.* at 9-25).

The elements of fraud under Alabama Code § 6-5-101 are: "(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala. 1987). "Willful misrepresentation of a material fact to induce another to act, and upon which he does act to his injury, will give a right of action." Ala. Code § 6-5-103.

Under Alabama law, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." Ala. Code § 6-5-104(a). A defendant can deceive a plaintiff by: (1) suggesting a fact which is not true when he does not believe it to be true; (2) asserting a fact which is not true when he has no reasonable grounds for believing the assertion to be true; (3) suppressing a fact which he is bound to disclose or which would clear up an inaccuracy in other disclosed information that is likely to be misleading in the absence of the suppressed information; or (4) making a promise with no intention of performing it. *Id.* § 6-5-104(b). A deceit claim essentially is similar to a fraud claim except "with respect to the state of mind of a party alleged to have defrauded another." *Med. Park Station, LLC v. 72 Madison, LLC*, 216 So. 3d 453, 458 n. 2 (Ala. Civ. App. 2016).

Here, Plaintiff wholly fails to explain how she acted in reliance on any purported false representation or deceitful act committed by Defendant Steyn. (*See* Doc. # 67 at 9-25). Indeed, although Plaintiff alleges in her Second Amended Complaint that she suffered losses due to Steyn's fraudulent and deceitful conduct, she has not alleged how she acted or altered her

position based on Steyn's alleged conduct. (*See* Doc. # 23 at ¶¶ 46-50). Further, to the extent Plaintiff argues that she submitted her February 2014 letter in reliance on Defendant Steyn's misrepresentations, that fraud/deceit claim fails for two reasons. First, Plaintiff suffered no damages based upon her submission of the February 2014 letter because UAB permitted her to rescind the letter in May 2014. (*See* Doc. # 64-16 at 58). Second, Plaintiff cannot pursue a fraud, deceit, or misrepresentation claim based on submitting her February 2014 letter because she did not plead that claim in her Second Amended Complaint. (*See* Doc. # 23 at ¶¶ 46-50). *See also Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1228 (11th Cir. 2013) (holding that a district court may not construe an opposition brief to a summary judgment motion as an effective motion to amend the complaint). To be sure, UAB acted on Defendant Steyn's assertions when it terminated Plaintiff from employment, but there is no basis for a factfinder to determine that Plaintiff acted on those assertions to her detriment. Accordingly, Defendant Steyn is entitled to summary judgment on Plaintiff's fraud and deceit claims in Count IV of the Second Amended Complaint.

### D. Defendant Board of Trustees is Entitled to Summary Judgment on Plaintiff's First Amendment Retaliation Claim

In its summary judgment motion, Defendant Board of Trustees argues that it is entitled to Eleventh Amendment immunity from Plaintiff's First Amendment retaliation claim. (Doc. # 61 at 29-30). It also argues that the First Amendment retaliation claim is due to be dismissed for the same reasons that the court dismissed the claim against Dr. Steyn. (*Id.* at 31). Plaintiff has not responded to the Board of Trustees' argument for dismissing this claim in her opposition brief. (*See generally* Doc. # 67). Accordingly, the court concludes that Defendant Board of Trustees is due to be granted summary judgment on the First Amendment retaliation claim because Plaintiff

effectively abandoned that claim.[10]  *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325-26 (11th Cir. 2000) (holding that a state-law claim was effectively abandoned when a party failed to brief and argue the issue before the district court). Additionally, and in any event, the court alternatively concludes that Plaintiff's First Amendment retaliation claim fails because the Rule 56 record makes clear that she spoke in her capacity as an employee when raising safety complaints, for the reasons stated in the court's earlier Memorandum Opinion.  (Doc. # 50 at 6-10).

## IV.   Conclusion

For the reasons explained above, Defendant Board of Trustees is due to be granted summary judgment on all of Plaintiff's claims in the Second Amended Complaint, except for Plaintiff's Title VII race discrimination claim in Count I.  Defendant Steyn is due to be granted summary judgment on the deceit and misrepresentation claim against him in Count IV.  An Order consistent with this Memorandum Opinion will be entered.

DONE and ORDERED this September 5, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[10]  The court agrees with Defendant Board of Trustees that it is entitled to Eleventh Amendment immunity from Plaintiff's First Amendment retaliation claim to the extent that she seeks monetary damages.  But, the Board of Trustees is not entitled to Eleventh Amendment immunity from the First Amendment claim to the extent that Plaintiff seeks reinstatement.  *See generally Lane v. Cent. Ala. Comm. Coll.*, 772 F.3d 1349 (11th Cir. 2014).  In any event, as explained more fully below, Plaintiff's First Amendment retaliation claim fails on the merits and effectively has been abandoned at the summary judgment stage.